## OF THE

# SUPERIOR COURTS OF GEORGIA.

## RICHMOND SUPERIOR COURT,

### JANUARY TERM, 1842.

### IN EQUITY.

JAMES GARDNER, JR., Adm'r. &c. of JAMES SPANN, Dec'd. vs. HENRY H. CUMMING and ANTOINE PICQUET, Executors, &c. of JOHN FOX, Dec'd.

*Bill for Account and Relief.     Verdict for the Complainant.*

1st. The Court will not hear a motion for a new trial at the next term after Judgment is rendered, if the Judgment was entered and recorded, unless there was some action of the Court to stay the proceedings, although the counsel gave notice of the application and the grounds.

2nd. When, during the existence of a partnership, one of the partners dies, the Statute of Limitations does not commence running in favour of the surviving partner, until there is an administration on the estate of the deceased partner.

3rd. A surviving partner is entitled to the controul of the partnership effects, for the payment of debts, and for the residue, he is responsible, not to the widow or children of the deceased partner, with whom there is no privity, but to the executor or administrator, who alone can demand his part of the partnership effects, after the payment of debts.

4th. In such case, the Equitable bar is analagous to the Statute of Limitations, and does not commence running until there is an administration.

5th. After a lapse of 20 years it will not be presumed from the mere receipt of the Register of Probates for his fees, that there was an administration on an intestate's estate, when the Records, which appear to have been well preserved, furnish no evidence that administration was granted.

[Adm'r. Spann vs. Ex'rs. Fox.]

6th. Under an allegation of a Bill in Chancery, by the administrator of a deceased partner against the executor of the surviving partner, "that the surviving partner used the co-partnership funds in merchandizing," his books are admissible in evidence to shew the profits he made.

7th. A surviving partner is liable to the representative of his deceased partner for a moiety of the profits of the co-partnership effects used in trade; or if he employs them and makes interest, for the interest on his share, deducting necessary expenses.

8th. The affidavit of a Juror in a civil case, cannot be received to shew what transpired in the Jury room, for the purpose of impeaching a verdict returned by him under oath, and to which he must have assented.

In the above stated case, the complainant has obtained two verdicts by Special Juries, against the defendants. The last verdict for a less amount than the first. The last verdict was obtained at June term, 1841 ; and at or near the end of that term, on the 7th day of July, service of a notice for a new trial was acknowledged by the complainant's counsel upon the grounds therein stated, and which are set forth in this decision, in which the defendants move for a new trial, complaining of the errors of both Court and Jury ; and during that term the defendants moved the Court for a new trial on the grounds referred to above, and for a supersedeas : The complainant's counsel declared themselves ready to argue the grounds. The defendants' counsel then enquired of the Court, whether it would decide upon the grounds during this term. The Court answered, that it would do in this case like all other cases, and if there were any good reasons shewn why the Court should not make its decision at this term, it would continue it ; but if no such grounds were shewn, the Court would proceed and decide upon the grounds of the motion : upon which information the defendants' counsel stated that they withdrew their motion for a supersedeas and filing the grounds ; but said that they did not withdraw their notice to the complainant of their grounds, at the same term when the verdict was rendered. The Court was moved for its final decree in the cause, which the Court signed and ordered to be recorded with the other proceedings in the cause, and upon which decree the Clerk issued an execution according to the rules of Court in such case made and provided. The finding of the Jury being for a certain sum—at the next term after the decree was signed (January term, 1842) the counsel for defendants handed to the Court the grounds presented to the Court

and withdrawn at the June term previous, and asked of the Court to be heard on them, and a day was appointed on which the Court would hear counsel for and against the motion.

The complainant's counsel resisted the motion upon the ground that it came *too late*, and that the Court had no judicial power at this term to entertain the motion, or discuss its merits. The defendants insisted that they were still in time to be heard, and that the Court had the power to entertain the motion and grant a new trial.

The Court decided that it would hear all the objections and arguments for and against the power of the Court now to entertain the motion, as well as the reasons for and against granting a new trial; and if the Court should decide that it could now entertain the motion, it would proceed and examine the same. The Court has examined the subject, and by reference to the law finds it to be as follows :—By the Judiciary Act of 1799, (*Prince's* D. 432,) it is provided, "That " the Superior Courts shall have power to correct errors and grant new " trials in any cause depending in any of the said Superior Courts, in " such manner and under such rules and regulations as they may " establish, and according to Law and usages and customs of Courts."

The question under this Law, is—What are the usages and customs of Courts in granting new trials? By a reference to the Laws of England, (*Tidd's* Practice, 813,) it is the practice of the successful party to serve the failing party with a notice that he will move the Court to sign judgment, and if no sufficient cause be shewn within four days, the party enters his judgment : and at page 819 of *Tidd's* Practice, he says—The motion for a new trial must be made within four days, exclusive, after the entry of a rule for judgment ; and if it be not made within that time, the party complaining cannot afterwards *be heard on the subject of a new trial*, and that there is no difference in this respect between civil and criminal cases. *Douglass*, 171. 5 *T*. Rep., 426 : and by the Judiciary Act of 1799. *Prince's* D. 436, judgment may be signed by the party in whose favor it is given, at any time within four days after the adjournment of the Court : by which provision it would appear, that the Legislature intended to give to the party against whom a verdict is rendered, the whole of the term at which the verdict is rendered, to move the

[Adm'r. Spann vs. Ex'rs. Fox.]

Court for a new trial, and obtain a supersedeas, so as to prevent the entering up of final judgment, and the issuing of an execution thereon ; and I suppose, that the practice of serving a four day rule to sign judgment is unnecessary, as the party in whose favour the verdict was rendered might sign the same within the four days after the term at which it was rendered, unless prevented by some action of the Court during that term ; for so long as the proceedings remain in fieri, and the term has not ended, they remain subject to the order of the Court—but after the term has ended, and the Judge signed the minutes of the Court, the term is ended, and the party as matter of right may sign his judgment in the Clerk's office at any time within four days after the adjournment of the Court, for the amount of such verdict, and all legal costs ; and no execution shall issue, until judgment be so signed by the party, or his attorney, (*Prince's* **D.** 426)—and by the Act of 1799, (page 428,) it is made the duty of the Clerks of the several Courts in this State, to copy into a book of record all the proceedings in all civil causes in the said Courts respectively, which entry of record shall be made within forty days after the determination of any cause. And from this provision it appears that said proceedings must be made matter of record, and no longer remain in fieri. After the forty days, (this being the time allowed to the Clerk to put them on record,) and after a final judgment is entered, and the same is recorded, and which the Clerk may do at any time after the four days after Court—What power has the Court over its judgment thus entered and recorded ? Will a mere notice by a party, against whom a verdict has been rendered, to the party in whose favour it is rendered, have the effect of staying the Clerk from making it matter of record, or of issuing an execution on such judgment, and delivering the same to the Sheriff to be executed ?

The 61st Rule of Court, made by the Judges in Convention, is conclusive on this subject. That rule provides, " that a motion for " a new trial shall not operate as a supersedeas, unless an order to " that effect be entered on the minutes of the Court, and in every " application for a new trial, a brief of the testimony in the cause " shall be filed by the party applying for such new trial, under the " revision and approval of the Court." It will appear from the foregoing references to the Laws, and Rule of Court, that the usages and customs of Courts in granting new trials, under the section of the Judiciary Act of 1799, before referred to, are as follows :

[Adm'r. Spann vs. Ex'rs. Fox.]

When a final verdict is rendered, in a cause upon appeal, by a Special Jury, the party dissatisfied with the verdict, and wishing a new trial, must make a motion in Court, (at the term when the verdict is rendered,) by first serving the opposite party with a notice of such grounds ; and then, on or before the adjournment of the Court, obtain an order of the Court, that the grounds be filed with the Clerk, and that such filing of the grounds operate as a supersedeas to any farther proceeding in the cause. And a brief of the testimony must be filed by the party applying for such new trial under the revision and approval of the Court.

Now let us refer to the facts hereinbefore set forth, and let us see whether these requisitions of the Law and Practice of Courts have been complied with, so as to enable this Court, at this time, to entertain this motion and examine and decide upon the several grounds taken for a new trial, from the facts before set forth. It appears that at the term when the verdict on the appeal trial was rendered, the defendants made out their grounds for a new trial, and the complainant's counsel acknowledged service of the notice ; after which the defendants moved the Court for leave to file the grounds for a new trial, and that *they* act as a supersedeas to all further proceedings in the cause. Upon which the complainant's counsel declared themselves ready to argue the motion ; and after some enquiry by the counsel of defendants from the Court, as before stated, the defendants' counsel withdrew their motion before the Court for filing their grounds for a new trial and a supersedeas, but stated that they did not withdraw their notice to the complainant's counsel of the grounds for a new trial. The Court replied, that it was with the defendants, either to make or withdraw their motion, as they might decide, and no further action was had in the cause. The final decree of the Court was entered on the verdict of the Special Jury, under the rules of Court, for the sum found by them, and decreed to be collected, by issuing an execution for the sum so found. The Court adjourned, sine die, and an execution did issue, after the four days allowed by law had expired, and the proceedings in the cause, with the decree, ordered to be recorded. And at the succeeding term, (January term, 1842,) to which the execution was made returnable, the motion for a new trial is now made upon the grounds which were withdrawn from the Court at the term before, when the verdict was rendered, which

[Adm'r. Spann vs. Ex'rs. Fox.]

brings up the question—Can the Court, under the facts before stated, now entertain this motion, and decide upon the grounds now urged? Or, do the defendants now come too late with their motion for the Court to consider the same? The Court has already referred to the Common Law Rule, as laid down by Mr. TIDD, in his practice, as well as to the Judiciary Act of 1799, and the Rule of Court made by the Judges, to shew what is the Law and usages of Courts, in granting new trials. The Court will now refer to the decisions upon this subject, made by the Judges of the Middle Circuit. The *first* case of which we have any written decision, is the case in Columbia Superior Court, (September term, 1827,) made by Judge WILLIAM SCHLEY, in the case of *John Culbreath* vs. *Archibald Haggie*, et alias, in the matter of *Mary McNeel's* last will. The principle upon which that case was decided, is identical with this case. In that case, the party wished the Court to correct its error in Law, some years after its final judgment was pronounced and recorded. Here, the defendants ask the Court to correct its error, both in Law and fact, six months after its final decree is made and recorded. In the case referred to, Judge SCHLEY took time to examine the Law, and decided, that he could not re-examine a matter which had been decided, and the final judgment of the Court pronounced and recorded. And he uses this language: "That the Superior Court may correct its own errors in " Law, on motion, so long as the case is in *fieri*, and undetermined; " but after final judgment is pronounced and recorded, and the term " passed without leave granted by the Court to take a rule to set " aside the judgment, it is then too late for the Court to interfere, " because, according to the Common Law, a Court cannot reverse its " own judgments, when once they have been pronounced and record- " ed, for the cause is then at an end, and no longer before the Court."

The next was a case in Burke Superior Court—*Nusom* vs. *Munroe*. The defendant succeeded, and at the next term Col. GAMBLE gave notice and moved for a new trial. I there decided that he came too late, and refused to entertain the motion.

The next case was one in Jefferson Superior Court, of *Cooner* vs. *Gregory*, in which the defendant obtained a verdict, and during the term the plaintiff's counsel, CRAWFORD and SCHLEY, gave notice to Col. GAMBLE, the defendant's counsel, that they should move the

[Adm'r. Spann vs. Ex'rs. Fox.]

Court for a new trial upon the grounds stated, and the motion for a new trial was partially argued, but no decision had, nor any rule of the Court was obtained to shew cause or stay the judgment, and at the succeeding term the motion was renewed, but resisted by Col. GAMBLE upon the grounds taken in Burke Court against him ; and it appearing that no order of the Court had been entered to stay further proceedings, and the judgment of the Court being recorded, and the term ended, the Court refused to entertain the motion.

Therefore, upon a full review of the facts, the Law, the Rules of Court, and the concurring decisions of the Judges of the Middle Circuit, and usages and practice of Courts, this Court is of opinion, and hereby decides, that the motion for a new trial upon the grounds stated, comes too late, and that it is not within the judicial power of this Court, and at this term, to entertain the motion of a new trial, after its final decree has been pronounced and recorded, and the term passed by, without any action of the Court to stay the proceedings, at the term when the decree was finally pronounced.

But as this case has been fully and ably argued upon its merits by the counsel on both sides, and as the principles involved are of much importance, and frequently occur in practice, the Court would be wanting in courtesy, if not in duty, not to express its opinion upon all the grounds taken for a new trial.

And in order to this, the Court will first state the facts which were in evidence, and were in substance, as follows :—*John Fox,* during the war, was one of the Loyalists, and *James Spann*, his brother-in-law, was one called a Whig, and after the war ended, *John Fox* returned to the State of Georgia, and he and his brother-in-law, *James Spann*, went into merchandizing in the city of Augusta, under the name of *James Spann & Co.*, in the year 1792 or 3, and continued their partnership, till the death of *James Spann*, which was about the year 1794, making about two or three years in which the business was carried on : but what amount of capital each furnished does not appear.    And after the death of *James Spann*, *John Fox* (as surviving partner) continued the business without any change in the books, or any settlement of the partnership concern.    Nor did the books of the firm shew, that any change or the business had been

made after the death of *James Spann,* except a letter, written by *John Fox,* to one of his mercantile correspondents, in 1795, that he should in future direct his letters to *John Fox & Co.* After the death of *James Spann, Mrs. Spann* (the widow) continued to reside in Augusta, and her brother, *John Fox,* and his *Clerks,* boarded with her; and after two years, she removed from Augusta to South Carolina, and resided for many years on a plantation of *John Fox's.* *James Spann,* at his death, left four children—a son and three daughters—who, after their removal, continued to reside in Carolina; but in the year 1810, *James Spann* (the son, and youngest child) returned to Augusta, and resided there for some years. At the death of *James Spann, Sen'r.,* the eldest child was about five or six years of age, and in 1810, must have been about twenty-one years of age. In the year 1794, *John Fox* and *Mrs. Spann* applied to the Register of Probates, in Augusta, for letters of administration on the estate of *James Spann,* dec'd., and paid the fees of administration: but no further proceedings are to be found on Record in the Ordinary's office, except the application for letters and the payment of fees; and there was no evidence offered of any destruction of the Records of the Ordinary's office, and consequently there was no evidence of administration on the estate of *James Spann,* dec'd., until administration was taken out by the present complainant, *James Gardner,* as administrator on the estate of *James Spann,* dec'd., in the year 1838. The books and receipts, and other papers belonging to *James Spann & Co.,* and subsequently continued by *John Fox,* were drawn from the executors of *Fox,* by a notice served on them to produce *them,* and were admitted in evidence before the Jury—and the Court permitted the books to be given in evidence to the latest period of their connection with the dealings of *James Spann & Co.;* and these books and receipts, drawn from the executors of *Fox,* were the only data from which the Jury made their verdict, against the estate of *John Fox,* dec'd. *John Fox* continued to reside in Augusta to the time of his death, which was in the year 1836—and he left a Will—and the defendants are the surviving executors, and against whom the before stated Bill was filed, for an account of the funds of *James Spann,* dec'd., in the hands of *John Fox,* dec'd., as the surviving co-partner of *James Spann & Co.* This Bill was filed in 1838, and upon which Bill two Special Juries have found verdicts for complainant. The first verdict was for $112,500—the last Jury found a

[Adm'r. Spann vs. Ex'rs. Fox.]

verdict for $103,733 04c. The defendants answered the Bill, and insisted on the lapse of time, or the equitable bar, as protecting them from any decree in favour of the complainant ; and the Jury were appealed to as twelve Chancellors, independent of the opinion of the Court, who were bound to apply the lapse of time as an equitable bar to the complainant's recovery. The Jury, differing from the counsel for defendants, found the verdict as last stated. And a motion is now made for a new trial, upon seven grounds taken, and which will be severally considered by the Court, but not in the precise order in which they are stated by the defendants' counsel.

I shall, therefore, consider the second ground before the others— which is, "That this Court erred, in charging the Jury, that the " claim of the complainant, was not barred by the lapse of time, from " 1793, when *James Spann* died, till 1838, when said Bill was filed." In considering this ground, it is necessary to enquire, in what point of view does a Court of Equity apply the lapse of time ? It applies it by way of evidence, and considers it as furnishing proofs of the satisfaction of the demand. If, after a long lapse of time, say twenty years, or more, a party who was *competent to sue,* and a defendant *against whom suit could be brought,* were to lie by without rendering to the Court a sufficient reason for not pursuing their remedy within the time prescribed by the statute of limitations, if within such statute, or within the time usually assumed by Courts of Equity, when the demand is purely of an equitable nature, and which is generally twenty years—in such cases the Court and Jury would enforce the equitable bar by lapse of time, and that this lapse of time operates by way of evidence, (see 4 *Johns.* Ch. R. 293. 1 *Harris & Johnson* R. 204. 12 *Vesey's* C. R. 355. 5 *Johns.* Ch. R. 550,) and when the statute of limitations is applicable to any demand sought to be enforced in Equity, it is applied, not as a punishment of those who neglect to assert their rights, but for the protection of those who have remained in possession under a title supposed to be good. 2 *Wheat.* 25.

Whether the lapse of time insisted on under this ground, be taken purely as an equitable claim, and only relievable in a Court of Equity, or whether it is considered as likewise suable at Law, and therefore the remedies in this case as *concurrent,* I apprehend that the con-

b

struction and application of the statute and the equitable bar, must be the same in Courts of Equity, as well as Courts of Law. (See 6 *Marshall's* Ky. R. 214. Ibid. 163. Also, 3 *Starkie's* Ev. 1217. Also, see *Sugd.* L. V. and P. 242.)—He says: "Equitable rights, in "general, will, by the like analogy, be effected by time in the same "manner as legal estates, and the legal provisions are so strictly "adhered to, that persons laboring under any of the disabilities "specified in the statute of limitations, will be allowed the same time "as they would be entitled to in the case of a legal claim." (3 *Johns.* Ch. R. 139 and 144. 7 English C. L. Rep. 66. 1 *Harris & Johns.* R. 339. 4 *Bro.* C. C. 441.)—and hence the necessity for a knowledge of all the cases, whether decided at Law or in Equity. Mr. CHITTY, in his general Practice, (see 1 vol., p. 760)—and the same page he says: Every new *right of Action in Equity* must be acted upon within twenty years *after it accrues*. (2 *Sch. & Lef.* 633. 1 *Turn. & Russ.* 118—636.) And this will bring us to the question, as to when there was a cause of action against *John Fox*, the surviving co-partner of *James Spann & Co.* It is contended by defendants, that the distributees of *James Spann* could have sued *John Fox*, as surviving co-partner, without any administration on the estate of *James Spann.* And this position is denied by the complainant, he insisting that there is no privity either in Law or in Equity, between the distributees of *Spann*, and *Fox*, the surviving co-partner—(*Charlt.* R. 6. 6 *Marshall's* Ky. R. 20. 1 *Marshall,* 10.)—that the heirs of *Spann*, (*as such,*) cannot enforce the rights of their ancestor, except by an administration on his estate; and then the rights of creditors would be paramount to the heirs of *Spann*. No other authorities were adduced to this point, on either side; but the Court was referred to a case decided by Judge HOLT, in Burke Superior Court, of *Dickinson* vs. the administrators of *Batt Jones*, dec'd.—where *Dickinson*, as legatee, under the Will of *Jones*, filed his Bill to recover the legacy from the administrator of the executor of *Jones*, and the Court decided, that *Dickinson*, as legatee, could not recover in Equity, except from the executor of *Jones* ; and he being dead, there was no privity between him, as legatee, and the administrator of the executor. And the principle has been so often decided in the Middle Circuit, that the distributees of an estate cannot recover, over the right of the executor or administrator, that it is not now considered an open question, there being no privity between the dis-

[Adm'r. Spann vs. Ex'rs. Fox.]

tributees of an estate and any third person who may have the property of deceased in possession, as none but the executor or administrator can reduce the same to possession, and then pay the debts and expenses of administration, and distribute the residue according to Law.

The next question to be considered, is—When did the cause of action, either in Law, or in Equity, accrue? "Not until the claimant could legally sue." (1 *Chitty's* Gen'l. Practice, 765.) And in the same page, Mr. CHITTY says: "The term *cause of* " *action*, implies not only a right of action; but also, that there " is some person in existence, who could *assert it,* and also a person " to be sued—and therefore, when the payee of a bill was dead, when " it became due, it was held that the statute did not begin to run, until " letters of administration had been obtained by *some one.*" (*Douglass* vs. *Forest:* 4 *Bing.* 686.  7 English C. L. 67.)  But it is contended by defendants, that *Spann,* in his life time, had a cause or right of action against his co-partner, *John Fox,* in his (*Fox's*) life time, by action of account for any thing that might be coming from *Fox* to *Spann,* and the statute of limitations had begun to run in the life time of *Spann,* and having once begun, no subsequent disability could stop it.  The *Court* admits the latter proposition to be true— that when the statute once begins to run, no subsequent disability will stop it.  But the Court does not admit the former part of the proposition—that any cause or right of action arose or accrued in the life time of *James Spann,* against his co-partner, *John Fox,* as it is contended by complainant there is no evidence that any dispute had arisen between the co-partners, but on the contrary, that they were doing a profitable business in merchandize, and were making large profits, and which was dissolved alone on account of the death of *James Spann.* The Court, therefore, cannot discover, that any cause of action had accrued in the life time of *James Spann,* and of course the statute never did commence to run against *James Spann,* in his life time.  If then, the children or distributees of *James Spann,* (*as such,*) could not sue *John Fox,* in his life time, the next question is—When did any cause of action accrue against him or his executors after his death?  It is admitted by the counsel, on both sides of this question, that *John Fox,* at the death of *James Spann,* was rightfully and lawfully in possession, as surviving co-partner, of the assets, bonds, notes and books of account, and could have recovered any of

them, either in Law or Equity, from either the children of *James Spann*, or his administrator, if there had been one, (see 6 *Cowen's* R. 441—*Murray* vs. *Mumford*,) so as to enable him, as the surviving partner, to settle up the concern of *James Spann & Co.*, and for this purpose, under the *Jus accrescendi*, the Law making him the legal owner of the assets; and he may, for the purposes before named, make sale of any, or all of the assets of the firm, if needed, to pay the debts—and then the Law, relating to co-partners, makes him a trustee, to account and pay over a moiety of the net profits to the administrator of the deceased partner. The possession of *John Fox*, as surviving co-partner of *James Spann & Co.*, was therefore a rightful one, and perfectly in accordance with the trust reposed in him *by law*, and the rights and claims of his *cestui que trust*, the administrator of *James Spann*, dec'd., (See *Kaine* vs. *Bloodgood*, 7 *Johns*. Chancery R. 121. See also as to surviving partner being a trustee, *Toller* Ex. 453. *Collier*, on partnership, 177 to 187,) *John Fox*, being rightfully in possession for the purposes stated, by the Law of co-partnership, he was not holding adversely to any one. (See 3 *Starkie* Evi. 1217. Also, 6 *Marshall* 163.) At what time, then, did *John Fox*, or his representatives, render himself liable to a suit, either in Law or Equity? As laid down by Mr. CHITTY, *not until there was some person in existence who could sue*, and give a release. And there being no such person in existence, until *James Gardner* took out administration on the estate of *James Spann*, dec'd., in the year 1838, this Court is bound to decide, that until the grant of administration, there was no one in existence, who could make any legal demand on *John Fox*, or his executors, since his death, or commence any suit, either in Law or Equity. And for the foregoing reasons, neither the statute of limitations, nor the equitable bar, could commence its operation against the administrator of *James Spann*, dec'd.—(see 6 *Marshall's* R. 214)—*but*, from the grant of administration to *James Gardner, jr.*, he is bound to make a demand on the executors of *Fox*, for an account of the profits of the concern of *Fox* and *Spann*, and to receive a moiety thereof, with profits made before and since the death of *James Spann*, if the funds were employed by *John Fox*—or simple interest, if *Fox* made that much by employing the funds of *James Spann*—(see *Collier*, on partnership, 186)—and on the refusal of the executors of *John Fox* thus to account, he (*Gardner*) was bound to commence his suit,

either in Law or Equity, and that too within the time limited by Law, as the remedy, since 1820, is a concurrent one, and therefore Equity will adopt the statute of limitations. But it is further contended by the defendants, that after a lapse of twenty years, or more, a Court of Equity will presume any and every thing, in order that men's estates may be quieted—that it will presume deeds, wills, records and grants; and the following, with many other cases, were cited by the defendants' counsel :—*Harper's* R. page 1. 2 *Consti.* R. (So. Ca.) 420. 1 *Bay's* R. 26. 2 *T.* R. 158–9. *Cowper* 100 and 102. 1 *Hill's* R. 222. 12 *Vesey's* R. 266. 1 *Hill's* C. R. 378. 9th *Peters'* R. 405 and 415. *Angel*, on Lim. 345. *Collier*, on Part. 207–8. 24 Law Lib. 310–610. English Cond'd. Ch. R. 240. 1 *Story's* E. 502. 2 *Story's* E. 735. 2 *Nott & McCor*. 96. 2nd. *Bailey* 101. *Jacob & Walker* 2. 2 *Bailey's* R. (So. Ca.) 597. And on the part of the complainant, it is urged, that Courts of Equity will only apply the statute of limitations where it applies, under the same rules, and observe the same exceptions, and give the same construction as a Court of Law will; and that Courts of Equity, where the statute does not apply, will enforce the equitable bar, under the following circumstances: 1st. That there must be proper parties in existence, capable of suing, or being sued, for the statute or the equitable bar to commence against. 2nd. When the rightful owner, suffering one who claims the estate, as his own, to make valuable improvements thereon. 3rd. To protect a bona fide purchaser, and without notice. 4th. To protect a long adverse possession, disputing the right claimed, and continuing that possession as adverse. 5th. Where a person is created a trustee by *aliunde* testimony, and by decree of a Court of Equity, with notice of the trust, but claiming by an adverse title as a resulting trust, &c. 6th. Where one, who by law, or contract, was bound to account, and refused, when called on by the person who had a right to demand it, the bar will commence from the refusal. (7 *Johns*. C. R. 123)—and a number of cases of like character, which it would be too tedious to mention. But when the trustee's possession is consistent with, and not adverse to, the rights of a *cestui que trust*, and who by Law has a right to recover, and retain possession, and hold the same until demanded by the *cestui que trust*, that such possession of the trustee is not adverse to the *cestui que trust*, until the *cestui que trust* is in a situation to make a demand, and fails to do so; or, having made a demand, the same was

refused by the trustee: and this doctrine applies to *trustees created by the Law*—(as was the case of *Kaine* vs. *Bloodgood*, 7 *Johns*. C. R. 135)—and that in this case, *John Fox* was a trustee created by the operation of the Law, as between co-partners—that no action, either in Law or Equity, accrued in the life time of *James Spann*, and that there was no right in any one to call on *John Fox*, until after the death of *James Spann*, and that no one but the administrator on the estate of *James Spann*, dec'd., could have made that demand—that no administration has ever been granted on the estate of *James Spann*, until the year 1838, to *James Gardner, jr.*, and *John Fox* could not denude himself of that trust, until some one was authorized to demand and receive it ; and that *John Fox*, in his life time, could not hold adversely to the equitable owner, because such person had never been created by the Ordinary : and, therefore, that neither the statute of limitations, nor the equitable bar, could in this case commence its operation, or raise any presumption of payment and satisfaction by *John Fox*, in his life time. And in support of these positions, the complainant quotes the following authorities :—1 vol. *Chitty's* Gen'l. Practice, 765 and 786. 6 *Marshall's* R. 214 and 15 ; also, 163. *Adams*, on Ejectment, 47–58. *Mathews*, on Presumptions, 194, 197, 208. 4 *Munf.* 342. 4th *Dana.* Abridg. 200. 1 *Harris & Johns.* R. 339. 1 *Haywood's* R. 180, 247. 6 *Bingh.* 179–581. 3 *Murphey's* R. 144. 3 *Marshall* 15. 8 *Yerger* 240 and 1. 2 *Desaus.* C. R. 55. *Rice's* R. (So. Ca.) 339. 3 *Leigh's* R. (Virginia) 349. 2 *Schoale & Lefroy* 630. English C. L. R. 67. 5 *Barn & Alderson* Equity Evidence 158. 1 *Page's* R. 393. *Collier*, on Part. 186. 7 English Com. L. R. 66. 3 *Bro.* C. C. 640. 20 *Johns.* R. 580. 1 *B. & Beaty* C. R. 156. 1 *Schoale & Lefroy* 231. *Harris & Johns.* R. 204. 4 *Johns.* C. R. 293. 2 *Ves., jr.* 93 and 272. *Jacob & Walker* 51. Upon an examination and comparison of the authorities cited on both sides of this question, the Court has deduced the following conclusions :

1st. That no cause of action had accrued to *James Spann*, in his life time, against his co-partner, *John Fox*, and therefore neither the statute nor the equitable bar had commenced against *James Spann*, in favour of *John Fox*.

2nd. That the children and widow of *James Spann*, dec'd., as such

distributees, had no equitable or legal right to sue *John Fox*, as surviving co-partner of *James Spann & Co.* ; nor could they have given *John Fox* a release.

3rd. That *John Fox*, as surviving partner, was lawfully seized of the property, books, and other evidences of debt, belonging to *James Spann & Co.*, (see 6 *Cowen* 441,) and had a right to retain them until some one was authorized by Law, as the representative of *James Spann's* estate, to demand a moiety.

4th. That none but the administrator of *James Spann* could make such demand, and give a release.

5th. That until the Ordinary granted such administration, and clothed some one with the authority to reduce the moiety coming to the estate of *Spann*, into possession, neither the statute of limitation nor the equitable bar, could commence their operation against the estate of *Spann*, and in favour of *Fox*, the possession not being adverse. (See 6 *Marshall's* R. 163 and 214. 7 English Com. Law Rep'ts. 66. 3 *Bro*. C. C. 640.)

6th. That *John Fox*, as surviving partner, could not hold adversely to the estate of *Spann*, until the grant of administration on the estate of *Spann* to *James Gardner*, *jr.*, (the present complainant,) in the year 1838 : and on which conclusions, this Court decides—that it did not err, when it charged the Jury, that neither the statute of limitations, nor the equitable bar, by lapse of time, could be successfully set up, to prevent the complainant's recovery.

The next ground to be considered by the Court, is, " That the " Court erred in charging the Jury, that a record of the grant of " administration upon the estate of *James Spann*, dec'd., in the year " 1794, could not be presumed from the lapse of time, although such " a presumption would have been supported by the receipt of the " Register of Probates, in evidence."

If it is insisted, that the receipt of the Register of Probates, for his fees, created the presumption, this presumption was amply rebutted by the facts, that the application for letters was the only evidence in

the office, and no further proceedings were to be found. Nor was there any evidence offered, that the records of the Register's office had ever been destroyed; but on the contrary, it is conceded, that the records of that office had not been destroyed, and no grant of administration is found of record—no bond filed—no schedule returned—and no settlement of any kind: which, it seems, would outweigh the mere fact of an application appearing and a receipt for fees. This presumption was therefore rebutted by the other facts in the case.

But if it be contended, that the Court ought to have charged the Jury, that from the long lapse of time which had expired from the death of *Spann*, and to protect one who had been in possession under a claim of right, and adverse to the estate of *Spann*—then, without any evidence to induce a presumption, this Court would have been bound to charge the Jury, that to quiet the adverse possession, they were bound so to presume, although they did not believe the fact to be so, as these presumptions are made by Courts, not because there is any evidence that the facts are *so*, but because the facts ought to be so: in order that long continued adverse possession—or a purchaser, for a valuable consideration, holding adversely under a purchase—or when a person having a *right to sue*, stands by, or neglects to sue, and permits another person to treat the property as his own, for a long lapse of time, and many other such cases. (See *Johns*. C. R. 550.) Let us then enquire, was *John Fox* standing in any of the relations before mentioned towards the administrator on the estate of *James Spann*, dec'd., which would have called on the Court to charge the Jury, that they should have presumed a matter of record against the fact, and in favour of *John Fox*. The first question is—At what time did *John Fox* denude himself of his character of trustee, as surviving partner: or, how could he have done so until administration was taken out on the estate of *James Spann*, dec'd., whereby he could have begun to hold adversely. The Court cannot see how it could have taken place; but, on the contrary, the Court holds, that *Fox's* possession was strictly in accordance with the trust reposed by law in him, and that therefore *his* possession was the possession of his *cestui que trust*, the administrator of *Spann*. (See 3 *Starkie* Evi. 1217.) And in all these cases, the question *is*— Could the trustee have maintained an action at Law, to recover the

[Adm'r. Spann vs. Ex'rs. Fox.]

property of *James Spann & Co.?* If so, the legal estate being in him, his possession was consistent with the rights of the *cestui que trust,* (see 6 *Marshall* 163–214,) and that *Fox* could recover at Law, (see 6 *Cowen* 441,) and that the statute of limitations could not run, and a *fortiori* the equitable bar, (see 7 *Johns.* Ch. R. 122,) and for these reasons, the Court decides: that it did not err, when it charged the Jury, that under the facts in this case, they could not presume a record of administration on the estate of *James Spann,* when the records of the Ordinary proved the contrary.

"Ground the Third. That the Court erred, in admitting in evi-"dence, on the trial of said cause, the books of account of said *John* "*Fox,* kept after October, 1795, when it was in evidence, the firm "name of *James Spann & Co.,* was abandoned by him, and a new "business commenced, under the firm of *John Fox & Co.* There "being no allegation in the Bill to authorize such evidence, or to ap-"prise the defendants that it would be relied on in said cause." The Bill alleged, that *John Fox* had made large profits, by continuing the business, and using the co-partnership funds in merchandizing, and, under this allegation, the Court decided, that so long as the books kept by *John Fox* would shew a connection with the funds of *James Spann & Co.,* the books were competent evidence for the complain-ant in following those funds; and there was no evidence that the firm books were changed, or that said firm was changed, except a letter written by *John Fox* to one of his mercantile correspondents, that he wished him in future to direct his letters to *John Fox & Co.,* but the books did not shew any such change at that time—and there-fore the Court did not err, in letting the books kept by *John Fox* go in evidence, so long as there was any connection traced with *them* and the concern of *James Spann & Co.,* as by Law the complainant had a right to follow the funds, so long as they were used or employed by *Fox,* the surviving partner. (*Collier* on Part'p. 186. 1 *Page* R. 393 and 9. *Jacob & Walker* 128.

"The fourth ground, is: That the Court erred in charging the "Jury, that Interest was recoverable on the amount due by *John Fox* "to *James Spann,* while the Court held that *John Fox* could not "discharge himself by payment of such amount to any person, be-"cause there was no administration on the estate of *James Spann.*"

c

[Adm'r. Spann vs. Ex'rs. Fox.]

In relation to this ground, the Court charged the Jury, that the complainant had a right to follow the funds of *James Spann & Co.*, and if they found that *John Fox*, the surviving co-partner, had employed the funds of the co-partnership, and had thereby made profits more than eight per cent., they might find a moiety of such profits, or if *Fox* had made 8 per cent. interest, he would be responsible for the interest—as he continued to use the fund, he was answerable for its profit; but if *John Fox* did not use the funds, then he was not answerable for interest. And in this part of the Court's charge, it does not believe that it did err, because *John Fox*, as surviving co-partner, was the legal owner, and might, if he chose, use the fund and make profits, and first pay the debts of the firm, and hold the overplus, as trustee, for the administrator of *James Spann*—and so long as *John Fox* could not denude himself of the trust, and he continued to employ the fund, he certainly was answerable for the profits, the Jury allowing him a reasonable compensation for his services, in so employing it: all of which was submitted by the Court to the consideration of the Jury. (*Collier*, on Part'p., 186. 1 *Page* R. 393 to 9. *Jacob & Walker* 128.

The fifth ground taken, is : That the Jury have erred, in allowing interest on the amount found by them to be due, and so consolidated the same with the principal in their verdict, that the Court cannot distinguish between them, and enter a decree in terms of the Law in such cases made and provided.

The sixth 'ground, is: That the Jury (although so instructed by the Court) have not, in their verdict, allowed to the defendants any deduction for the amount of *James Spann's* account, due to the firm.

The seventh ground taken, is: That the Jury have erred, in the basis and calculation by which they made their verdict—a duly verified statement of which is herewith submitted; in this: that they have allowed forty per cent. profit, on the amount of sales of the firm of *James Spann & Co.*, instead of on the cost of the goods sold, and have charged the defendants with one half of stock on hand, when upon the basis they adopted, the said stock was purchased on credit, and was paid for, or to be paid for, by *John Fox*.

[Adm'r. Spann vs. Ex'rs. Fox.]

The last three grounds taken—say the 5th, 6th and 7th—will all be considered by the Court at the same time, as they are all involved in the question—Whether the Court can judicially take notice of what passed in the Jury room, between the Jurors, as to the basis on which they formed their verdict? The evidence by which these last three grounds are brought to the knowledge of the Court, is, by the affidavit of two of the Jurors, setting forth the basis upon which their verdict was formed, and out of which the last three grounds arise: and the complainant objects to the legality of the evidence offered to prove the facts stated: and the objection taken, if sustained, will decide the three grounds. The Court will therefore decide upon said objection first. The question has been decided both ways, both in England and the several States. At one time the Courts held, that the affidavit of the Jury could be received, to shew in what manner they came to an agreement as to their verdict, whether by drawing lots, or each putting down a specified sum, and dividing by 12. (See 7 *Cowen* 562. 2 *Barnes* 438. 3 *Caines* 57. 1 *Root* 194. 2 Mass Rep. 541. 1 *Barnes* 441. 2 *Wm. Black.* 1299. 1 *Randolph* 39.

But the practice appears to be now generally settled, both in England and this Country, to reject the affidavits of Jurors, inculpating themselves; and if the Jury have adopted an irregular or illegal mode in making up their verdict, the Court must derive their knowledge from some other source, such as, from some person having seen the transaction through a window, or by some such other means. (See 1 *T.* R. 11. 1 New. R. 326. 4 *Johns.* Ch. R. 487. 5 *Cowen* 106. 6 *Cowen* 53. 2 *T.* R. 281. 5 *Burr.* 2667. 1 *Wendell* 297. 2 *Tyler* 11. 3 *Gil. & Johns.* 473. 1 *Harris & McHenry* 230. 2 *Moody & Ryl.* 216. From the cases before cited, the modern rule seems clearly to be, that the affidavit of the Jurors, in a civil case, cannot be received in evidence by the Court, on a motion for a new trial, in order to shew what passed in the Jury room, calculated to set aside their verdict, after having been returned under oath, and received by the Court, and they have separated: and this question has also been so decided in our own State, by Judge BERRIEN, in the Eastern Circuit. (See *Charlton's* R. page 1.) And I agree with the Court in its remarks in the case of *Robbins* vs. *Wendover*, (2 *Tyler* 11,) where they say—" This would open a novel and alarming

[Adm'r. Spann vs. Ex'rs. Fox.]

" source of litigation, and it would be difficult to say when a suit was
" terminated.   The Court consider it to be far better to establish it
" as a general rule, that the affidavits of Jurors, respecting the delib-
" erations which led to their verdict, should, in no civil cause, be
" admitted."

And I also concur, in the concluding remarks of the Court in
Pennsylvania, in the case of *Willing* vs. *Swasey*, (1 *Brown* 123,)
where the Court say—" And in my opinion it ought to be rejected,
" because it tends to defeat his own solemn act under oath, where
" third persons are interested.   It ought to be rejected, because its
" admission would open a door to tamper with Jurymen, after they
" had given their verdict.   It ought to be rejected, because it might
" be the means, in the hands of a dissatisfied Juror, to destroy a ver-
" dict at any time, after he had assented to it.   In fine, it ought to
" be rejected, because it would unsettle all the verdicts in the Coun-
" try."   See 18 English Com. Law R. 321.

Upon a review of the authorities before referred to, and the reasons
assigned for and against the rule, as to receiving the affidavits of
Jurors, shewing the manner of making up their verdict, and the
object of which is, to undo, or set aside their verdict, this Court is of
opinion, and so decides, that the modern rule of rejecting the affida-
vits of Jurors, for all such purposes, is the correct rule, and is better
calculated to preserve the stability of a Jury trial, than the contrary
rule of allowing such affidavits to affect their verdicts, and set them
aside.

The last three grounds are therefore overruled, because the Court
is not legally informed of their existence.

For the reasons assigned in the foregoing decision, upon all the
grounds taken for a new trial, a new trial is refused.

|  |  |
|---|---|
| *For the Defendants.* | *For the Complainant.* |
| Mr. BAUSKETT, | Mr. LONGSTREET, |
| Mr. LAW, | Mr. CRAWFORD, |
| Mr. McALLISTER, | Mr. SCHLEY. |
| Mr. MILLER. |  |

[Adm'r. Spann vs. Ex'rs. Fox.]

The Clerk of the Court will enter this decision on the minutes of the Court, and forward the original to the Governor of this State, as the Law directs.

JOHN SHLY, Judge
*Superior Courts, Middle District, Georgia.*